**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

UNITED STATES OF AMERICA      :
                                      :

v.                                     :
                                      :    CRIMINAL INDICTMENT

FREDERICK W. THOMAS,      :    NO.: 2:11-CR-044-RWS-SSC

EMORY DAN ROBERTS,      :

SAMUEL J. CRUMP, and      :

RAY H. ADAMS            :
                                      :

## <u>Detention Order</u>

## I.   <u>Background</u>

In a criminal indictment filed on November 3, 2011 [Doc. 8],[1] Defendants

Thomas and Roberts are charged with conspiracy to receive and possess

unregistered firearms, namely a destructive device and a silencer, in violation of

26 U.S.C. §§ 5861(d), 5871 (Count One); and with possession of an unregistered

firearm, namely a silencer, in violation of 26 U.S.C. §§ 5841, 5845(a)(7), 5861(d)

and 18 U.S.C. § 2 (Count Two).  Defendants Crump and Adams are charged in the

same indictment with conspiracy to develop, produce and possess a biological

toxin, namely ricin, for use as a weapon, in violation of 18 U.S.C. § 175(a) (Count

---

[1] The Government initially proceeded by way of criminal complaints against the defendants (<u>see</u> Doc.1 as to each defendant), and in reaching the decision to detain the defendants, the undersigned has relied, in part, on the allegations in the affidavits supporting those complaints. References to the complaints are designated, e.g., as "Thomas Aff. ¶ ___."

Three); and with attempt to produce a biological toxin, namely ricin, in violation of 18 U.S.C. §§ 175(a), 2 (Count Four).  (Id.).

The Government filed motions seeking detention of all four defendants.  (See Docs. 5, 20 (Crump); 5 (Thomas); 4, 19 (Adams); 4 (Roberts)).  With respect to Defendants Crump and Adams, the Government invoked the rebuttable presumption of 18 U.S.C. § 3142(e) on the ground that there is probable cause to believe those defendants committed an offense under 18 U.S.C. § 2332b(g)(5)(B), which defines federal crimes of terrorism.  The Court conducted a hearing on November 9, 15 and 16, 2011 (see Docs. 21, 27 & 29), and the Government proceeded against each defendant solely on the ground that there are no conditions of release that would reasonably assure the safety of any other person and the community.  The Government proffered Assistant United States Attorney Robert McBurney's summary of evidence against Defendant Thomas, as well as the criminal complaint filed against each defendant.  The Government also presented the testimony of F.B.I. Agent Korneski, the supervisor over the investigation of the defendants; played portions of surreptitiously recorded conversations of the defendants that occurred beginning in March 2011[2]; and offered several exhibits into evidence.  The defendants proffered their pre-trial services reports that were prepared by the United States Probation Office and each defendant presented witness testimony; all but Defendant Crump offered exhibits

---

[2] The court reporter did not transcribe the recordings that were played during the hearing. This Order sometimes cites to the paragraphs in the complaints that recite the recorded statements.

2

into evidence.  At the conclusion of the hearing on November 16, 2011, the undersigned found, with respect to each defendant, that there are no conditions of release that would reasonably assure the safety of the community and ordered that all of the defendants be detained pending resolution of the charges against them.  This Order further explains the reasons for the undersigned's oral Order of November 16, 2011.

## II.  **Analysis**

### A.  **Applicable Legal Principles**

Under the Bail Reform Act of 1966, "in determining whether there are conditions of release that will reasonably assure . . . the safety of . . . the community," the judicial officer is required to take into account "the available information concerning" the following:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of [18 U.S.C. § 1591], a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release

> pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).   If, after a detention hearing, the court "finds that no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community, [the court] shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e). "The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of . . . the community shall be supported by clear and convincing evidence." 18 U.S.C. § 3142(f)(2)(B).

If the judicial officer finds probable cause to believe that the person committed an offense listed in 18 U.S.C. § 2332b(g)(5)(B), then "[s]ubject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the safety of the community."   18 U.S.C. §§ 3142(e)(3), (e)(3)(C).   A grand jury indictment provides the probable cause required to raise the statutory presumption.   See United States v. Hurtado, 779 F.2d 1467, 1479 (11th Cir. 1985).   The burden of proving by clear and convincing evidence that there are no conditions that will reasonably assure the safety of the community remains on the Government.   See United States v. Quartermaine, 913 F.2d 910, 916 (11th Cir. 1990).   If a defendant successfully rebuts the statutory presumption, the presumption does not disappear but becomes evidence to be weighed, along with all other evidence, in determining the danger to the

4

community.  Id.

**B.**     **Findings and Conclusions**

Taking into account the factors to be considered under 18 U.S.C. § 3142(g) to determine whether there are conditions of release that will reasonably assure the safety of the community if the defendants are released pending trial, the undersigned's findings and conclusions as to each defendant are as follows:

**1.**     **Frederick Thomas**

**a.  Nature and Circumstances of the Offense Charged**

The offenses charged against Mr. Thomas involve firearms, including a destructive device and a silencer.  See 26 U.S.C. §§ 5845(a)(7), (8); see also 18 U.S.C. §§ 921(a)(3), (4), (24).  The Government contends that if convicted, Mr. Thomas faces the possibility of an enhanced sentence because his offenses involve domestic terrorism.  In the context of Mr. Thomas' recorded statements made over the past 8 months—in which he expressed his desire and intent to carry out assassinations of Government officials, including among others, IRS, ATF and FBI agents and judges—and Mr. Thomas' actions discussed *infra*, this factor weighs heavily in favor of detention.

### b.  <u>Weight of the Evidence</u>[3]

The information proffered and evidence presented at the detention hearing showed that Defendants Thomas and Roberts were members of a covert group within a larger, overt Georgia militia group.  The covert group was dedicated to planning and carrying out acts of violence against officials and employees of the United States.   Defendant Thomas was the most vocal of the covert group members, and he made numerous statements, captured by a recording device, demonstrating his desire and intent to kill Government officials and employees, both by targeted assassination and by use of explosive devices.  These statements include the following, among others:   statements that the group needed to establish a silent means of "taking people out," such as by using silencers on guns (Thomas Aff. ¶ 9), which Mr. Thomas said he "intend[s] to do" (Thomas Aff. ¶37); the rhetorical question, "Who do we want to shoot?" and the answer, "Lots of people; you cannot vote them out"; the statements, "There is no way for us, as militiamen, to save this country, to save Georgia, without doing something that's highly highly illegal.   Murder.   That's fucking illegal, but it's gotta be done" (Thomas Aff. ¶ 7); the statements, "I could shoot ATF and IRS all day long.  All the judges and the DOJ and the attorneys and prosecutors" (Thomas Aff. ¶ 14); statements that he had enough weapons to arm everyone present at a meeting of the covert group at his house (Thomas Aff. ¶ 5) and that he had bought some of

---

[3] "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt."  <u>United States v. Stone</u>, 608 F.3d 939, 948 (6th Cir.), <u>cert. denied</u>, 131 S. Ct. 439, 485 (2010).

his guns "cheap" so they could be thrown away; statements made during a trip to conduct surveillance on the IRS and ATF buildings in Atlanta, "Now of course this trip is reconnoitering.  There's two schools of thought on this: go for the feds or go for the locals.  And I'm inclined to consider both . . . . We'd have to blow the whole building, like Timothy McVeigh. . . . If we're gonna blow the buildings, it would be smart to hit 'em both at the same time. . . . Plant the explosives right up against the wall, a shaped charge.  We can do it." (Thomas Aff. ¶ 20); and statements that he was expendable, that he was not afraid to die and that he wanted to leave the country a better place for his grandchildren.  Mr. Thomas also discussed, with Defendant Roberts and another individual, acquiring TNT, building their own explosive devices and using pre-paid cell phone detonators. (Thomas Aff. ¶ 32).

The following actions and circumstances, coupled with his statements, show Mr. Thomas' dangerousness:

1. Mr. Thomas conducted physical surveillance of ATF and IRS buildings in Atlanta;

2. Mr. Thomas formed an affiliation with Co-defendants Ray Adams and Samuel Crump, who had made known their ability and desire to produce ricin, a biological toxin, for use as a weapon;

3. On November 1, 2011, Mr. Thomas attempted to purchase illegal explosives, namely two explosive devices (one was for "practice";  the other was for "real") that could be initiated by a cell phone; a lightening

link (which could be used to make a rifle that was included in Mr. Thomas' collection of firearms fully automatic); and a silencer (that was compatible with a gun included in Mr. Thomas' collection of firearms).[4]

4. A search of his residence following his arrest revealed that Mr. Thomas had acquired 52 weapons, including assault rifles, pistols with extended magazines and shot guns, among other firearms;

5. The search also revealed that Mr. Thomas had acquired 30,000 rounds of ammunition, some of which was subsonic, meaning that it makes little noise when fired, consistent with Mr. Thomas' expressed desire to carry out silent killings.

These facts weigh heavily in favor of detention.  The character evidence presented by testimony from Mr. Thomas' wife, son and friend does not alter that balance.  Nor does the testimony from Mr. Thomas' family members that he is simply a collector of guns, given the number and types of firearms found at his residence and the fact that the silencer and lightening link he attempted to purchase are compatible with some of those firearms, and given his statements that he could arm his confederates in the covert group and he bought his guns "cheap" so they could be thrown away.

---

[4] Mr. Thomas and his Co-defendant Mr. Roberts were arrested during that encounter.

### c.  <u>History and Characteristics</u>

Mr. Thomas is 73 years old and is retired.  He and his wife live on retirement and Social Security income.  He was in the U.S. Navy on active duty from 1958 until 1969, and then in the active reserves until his honorable discharge in 1989 at the rank of Chief Petty Officer.  He received a certificate of appreciation from President Bush (Def. Thomas Ex. 2).  Since leaving the Navy, he has been employed in a number of jobs with military contractors which required top secret clearance, but he has not been subject to background checks since he retired.  He lives with his wife, and they have children and grandchildren.  Mr. Thomas is in poor health—half his right lung was removed in February 2011; his carotid artery is partially blocked; he suffers from high blood pressure, high cholesterol, Type II diabetes and chronic obstructive pulmonary disease; and he uses oxygen on an "as-needed" basis.  His wife testified that he has injuries to his rotator cuffs and biceps that make him unable to raise his arms over his head.  He has no criminal history.

Mr. Thomas' history and characteristics do not in general weigh heavily either way in the dangerousness assessment.  Mr. Thomas' service in the Navy and subsequent Government work may be evidence of patriotism and love of country but do not preclude ill will or hatred of the Government.  The fact that, according to their testimony, his family and friend were unaware of Mr. Thomas' discussions, activities and plans with the covert group indicates secretiveness, not lack of dangerousness.

However, Mr. Thomas' age and poor health and the possibility of an enhanced sentence weigh moderately in favor of detention.  While his age and infirmity may indicate that he is not able to carry out an act of violence requiring strength and stamina, they do not make him incapable of committing other acts of violence, such as pulling the trigger on a handgun, carrying a bag with an explosive device in it or detonating a destructive device with a cell phone.  They may be evidence that Mr. Thomas feels he has nothing to lose by committing the violent acts he has discussed, and they may show his determination to carry out the group's plans despite age and infirmity, given that he has been able to attend meetings with other members of the covert group, travel to a militia meeting in South Georgia, travel to Atlanta to conduct surveillance of Government buildings, meet with an undercover agent he believed to be a black market firearms dealer and attend a meeting with an undercover agent on November 1, 2011 for the purpose of acquiring a silencer and what he thought would be explosive devices.

### d. Nature and Seriousness of the Danger Posed by Mr. Thomas' Release

There is strong, credible evidence that Mr. Thomas has been involved with a covert anti-Government group that has been planning to take violent action against Government officials and employees for some months.  The group's plans include, among other things, assassinations as well as blowing up Government buildings and exploding a car, with likely injury and/or death resulting to civilians; these plans were discussed for a period of at least 8 months; and the

group has taken concrete steps toward realizing their plans, including surveillance of Government buildings, attempts to acquire unregistered firearms (including destructive devices and silencers) and acquisition of the ingredients and recipe for making ricin, a biological toxin, to be used as a weapon, as discussed *infra*. The specific acts Mr. Thomas has taken to further these plans are described above.

This factor weighs heavily in favor of detention.

### e. <u>Inadequacy of Conditions of Release to Address Dangerousness</u>

Viewing all the statutory factors together, I conclude that, as to Defendant Thomas, there are no conditions of release that will reasonably assure the safety of the community. While the Government has seized the firearms and ammunition found at the residence of Defendant Thomas, that fact does not preclude the possibility that he could carry out the covert group's plans to some degree and in some fashion if released on bond. It does not with certainty eliminate his access to instruments of harm. For example, he may have other firearms secreted on his property or elsewhere, and he may, with a simple phone call, be able to obtain such weapons from a sympathizer or another member of the covert group who remains at large. Indeed, at least one such covert group member has previously provided a firearm to one of his co-defendants.

It is not likely that Mr. Thomas' demonstrated intent and determination to carry out acts of violence against Government officials and employees have diminished with his arrest and the initiation of this prosecution against him.

11

Rather, the contrary is true.  Mr. Thomas has expressed his desire, and shown his determination, to kill Government employees and officials and taken concrete actions to realize that goal.  Mr. Thomas has expressed the view that he is not afraid to die in the service of the covert group's cause.  Neither GPS monitoring, home confinement with electronic monitoring, a secured bond, nor any other condition suggested by counsel—or that the undersigned can imagine—will assure that, if released on bond, Mr. Thomas would not gain access to an instrument of harm and use it to carry out an act of violence against a Government official or employee, such as a United States Probation Officer assigned to monitor him prior to trial or United States Marshals designated to transport him to court appearances should he refuse to appear on his own.  Therefore, there are no conditions of release that will sufficiently and reasonably address his dangerousness.

### 2.  **Emory Roberts**

#### a.  **Nature and Circumstances of the Offense Charged**

The offenses charged against Mr. Roberts involve firearms, including a destructive device and a silencer.  See 26 U.S.C. §§ 5845(a)(7), (8); see also 18 U.S.C. §§ 921(a)(3), (4), (24). The Government contends that if convicted, Mr. Roberts faces the possibility of an enhanced sentence because his offenses involve domestic terrorism.  In the context of Mr. Roberts' (1) participation in meetings where statements have been made about assassinating Government officials, including among others, IRS ATF and FBI agents and judges and (2) Mr. Roberts'

own statements and actions, discussed *infra*, this factor weighs heavily in favor of detention.

### b.  Weight of the Evidence

The information proffered and evidence presented at the detention hearing showed that Defendants Thomas and Roberts were members of a covert group within a larger, overt  Georgia militia group.  The covert group was dedicated to planning and carrying out acts of violence against officials and employees of the United States.  Mr. Roberts demonstrated his solidarity with that mission by his participation in meetings where the more vocal Mr. Thomas discussed his desire and intent to commit acts of violence against Government officials and employees as well as methods of doing so; by his implicit and/or explicit agreement with Mr. Thomas' statements; and by his own statements and actions. Mr. Roberts' statements and actions include the following, among others:  At a March  2011 meeting of the covert group where Co-defendant Thomas discussed killing Government employees and  the need for the group to establish a silent means of "taking people out," including silencers for handguns, Mr. Roberts introduced the idea of killing people with a substance that was lethal in small amounts and said he knew people who had it, thus initiating a discussion of making ricin from castor beans (Roberts Aff.  ¶¶ 5-9); Mr. Roberts subsequently introduced Co-defendant Crump, who purported to know how to make ricin, into the covert group; during a road trip with Mr. Thomas in late April 2011, Mr. Thomas asked Mr. Roberts whether they should try to grow their group larger or stick to their

13

plan of "assassinating 4 or 5 guys," and Roberts replied, "I think probably we need both" (Roberts Aff. ¶¶ 15); on the occasion when Mr. Thomas stated that he was expendable, that he was not afraid to die and that he wanted to leave the country a better place for his grandchildren, Mr. Roberts responded that he felt "basically the same way"; in June 2011, Mr. Roberts and Mr. Thomas met with the undercover agent they thought was a black market arms dealer and told him they wanted to acquire explosives and silencers; at an August 1, 2011 meeting with Mr. Thomas and another individual, Mr. Roberts and the others discussed acquiring TNT and building their own explosive devices using pre-paid cell phone detonators (Roberts Aff. ¶ 32); Mr. Roberts and Mr. Thomas attempted to purchase two explosive devices, a silencer and a lightening link on November 1, 2011 from an undercover agent; search of Mr. Roberts residence following his arrest yielded several firearms, including one that had been provided to him by another member of the covert group.

This factor weighs heavily in favor of detention. The character evidence presented by testimony from Mr. Roberts' friend, brother and wife (or ex-wife, according to the Pre-trial Services Report), who apparently were unaware of Mr. Roberts' activities with the covert group, does not alter that balance.

14

### c.  History and Characteristics

Mr. Roberts is 67 years old, retired from self employment in a sign business and a lifelong resident of Stephens County, except for 5 years.  He lives with his wife (or ex-wife) and they rely on veterans disability, Social Security and SSI benefits for income.  He served in the infantry in Vietnam, where he suffered severe wounds that left him with hearing loss and residual pain in his arms, legs and feet.  He has other health problems, including diabetes, high blood pressure and arthritis.  He has four brothers who live in the North Georgia area.  He has no criminal history.

This factor in general does not carry significant weight either way in the dangerousness determination, but Mr. Roberts' age and poor health and the possibility of an enhanced sentence weigh moderately in favor of detention.  As with Mr. Thomas, Mr. Roberts' age and infirmity may indicate that he is not able to carry out an act of violence requiring strength and stamina, but they do not make him incapable of committing other acts of violence.  Coupled with his statement echoing Mr. Thomas' sentiment that he was not afraid to die in the service of their cause, Mr. Roberts' age and poor health, and the possibility of an enhanced sentence, may be evidence that he feels he has nothing to lose by committing the violent acts discussed by the covert group and may show his determination to carry out the group's plans despite age and infirmity.

### d. <u>Nature and Seriousness of the Danger Posed by Mr. Roberts' Release</u>

There is strong, credible evidence that Mr. Roberts has been involved with a covert anti-Government group that has been planning to take violent action against Government officials and employees for some months. The group's plans include, among other things, assassinations as well as blowing up Government buildings and exploding a car, with likely injury and/or death resulting to civilians; these plans were discussed for a period of at least 8 months; and the group has taken concrete steps toward realizing their plans, including surveillance of Government buildings, attempts to acquire unregistered firearms (including destructive devices and silencers) and acquisition of the ingredients and recipe for making ricin, a biological toxin, to be used as a weapon, as discussed *infra*. The specific acts Mr. Roberts has taken to further these plans are described above. This factor weighs heavily in favor of detention.

### e. <u>Inadequacy of Conditions of Release to Address Dangerousness</u>

Viewing all the statutory factors together, I conclude that, as to Defendant Roberts, there are no conditions of release that will reasonably assure the safety of the community. While the Government has seized the firearms and ammunition found at his residence, that fact does not preclude the possibility that he could carry out the covert group's plans to some degree and in some fashion if released on bond. It does not with certainty eliminate his access to instruments of harm. For example, he may have other firearms secreted on his property or

elsewhere, and he may, with a simple phone call, be able to obtain such weapons from a sympathizer or another member of the covert group who remains at large. Indeed, at least one such covert group member has previously provided a firearm to him.

It is not likely that Mr. Roberts' demonstrated intent and determination to carry out acts of violence against Government officials and employees have diminished with his arrest and the initiation of this prosecution against him. Rather, the contrary is true. Mr. Roberts has expressed his desire, and shown his determination, to kill Government employees and officials and taken concrete actions to realize that goal. Mr. Roberts has expressed the view that he is not afraid to die in the service of the covert group's cause. Neither GPS monitoring, home confinement with electronic monitoring, a secured bond, nor any other condition suggested by counsel—or that the undersigned can imagine—will assure that, if released on bond, Mr. Roberts would not gain access to an instrument of harm and use it to carry out an act of violence against a Government official or employee, such as a United States Probation Officer assigned to monitor him prior to trial or United States Marshals designated to transport him to court appearances should he refuse to appear on his own. Therefore, there are no conditions of release that will sufficiently and reasonably address his dangerousness.

### 3. **Samuel J. Crump**

#### a. **Nature and Circumstances of the Offense Charged**

The offenses charged in the indictment against Mr. Crump involve potential biological weapons, see 18 U.S.C. § 175(a), and are considered federal crimes of terrorism pursuant to 18 U.S.C. § 2332(g)(5)(B). Based on these charges, the Government has invoked the rebuttable presumption provided by 18 U.S.C. § 3142(e)(3)(C) that there are no conditions of release that will reasonably assure the safety of the community. If Mr. Crump is convicted, he faces a potential life sentence.

This factor weighs heavily in favor of detention.

#### b. **Weight of the Evidence**

Having been introduced to the covert group by Co-defendant Roberts, Mr. Crump told a confidential source who attended a meeting of the group at Co-defendant Adams' house in September 2011 that he used to work at the CDC and knew how to make ricin and that he would like to make about ten pounds of it and divide it into two-pound packages to be dispersed by himself, Co-defendants Roberts and Adams and others on highways in five major cities, including Atlanta; he explained that ricin is deadly and has no antidote[5] (Crump. Aff. ¶ 12); in a later conversation with the confidential source, Mr. Crump recited the recipe for ricin

---

[5] Agent Korneski testified that ricin is derived from the castor bean and that in its powder form it is 10,000 times more toxic than cyanide; that there is no known antidote; and that when introduced into humans by pinprick or inhalation, it can take up to four days to be lethal. The Government proffered that there is no benign use for ricin.

from memory[6] and explained that the ingredients included castor beans, lye and acetone and that he could obtain the beans and acetone but could not find the Red Devil lye needed (Crump. Aff. ¶ 20); in an October 15, 2011 meeting of Defendants Thomas, Roberts, Crump and Adams and others at Mr. Adams' residence, Mr. Adams produced from a storage container a bean—subsequently tested and found to be a castor bean—which he handed to Mr. Crump who in turn provided it to the confidential source, and Crump talked about building a hood, using a filter and wearing gloves and a mask in connection with the production of ricin (Crump. Aff. ¶¶ 24, 25); on October 29, 2011, Mr. Crump told the confidential source that he was going to shell castor beans at his house that week and he wanted the source to find Red Devil lye for him  (Crump. Aff. ¶ 27); the search of Mr. Crump's residence following his arrest on November 1, 2011 revealed a quantity of hulled castor beans.

This factor weighs heavily in favor of detention.

### c. History and Characteristics

Mr. Crump is 68 years old and has been retired since 2005 because of a health condition.  He relies on Social Security benefits for income.  He is a lifelong resident of North Georgia, with the exception of six weeks spent in Saudi Arabia. He rents a room from his sister.  He has siblings, three children in North Georgia, grandchildren and great grandchildren.  He has an "electrical license," and he

---

[6] Agent Korneski testified that it is possible to make ricin from the recipe Mr. Crump had memorized.

worked as electrical contractor for the CDC for some period of time.  Mr. Crump is in poor health: in 2005 he was diagnosed with lung cancer, which is currently in remission; he has had one lung removed.  His criminal history includes burglary and liquor manufacturing convictions more than 35 years ago.

As with Defendants Thomas and Roberts, Mr. Crump's age and infirmity may indicate that he is not able to carry out an act of violence requiring strength and stamina, but they do not make him incapable of committing other acts of violence or targeted assassinations or of producing, assisting in the production of, or using biological weapons.  Mr. Crump's work at the CDC may have given him access to information useful to the production of ricin, or to precautions necessary for safe handling of ricin.

All told, this factor weighs moderately in favor of detention.

### d. Nature and Seriousness of the Danger Posed by Mr. Crump's Release

There is strong, credible evidence that Mr. Crump has been involved with a covert anti-Government group that has been planning to take violent action against Government officials and employees and civilians.  The group's plans include killing Government employees and officials with silent methods, including by means of biological toxins that could also harm or kill civilians.  The group has taken concrete steps toward realizing their plans, including beginning the production of ricin using a recipe that is viable and that uses ingredients that are readily available.  Ricin is lethal, has no benign use, and no known antidote.

This factor weighs heavily in favor of detention.

### e. **Inadequacy of Conditions of Release to Address Dangerousness**

While the Government has seized the firearms and ammunition found at the residences of the other defendants (none were found at Defendant Crump's residence) and presumably the castor beans found at Mr. Crump's residence, that fact does not preclude the possibility that Mr. Crump could carry out the covert group's plans to some degree and in some fashion if released on bond. It does not with certainty eliminate his access to instruments of harm, including the readily available ingredients to make ricin. Mr. Crump was overheard to say that acetone is available at tractor supply stores; there was testimony that lye can be made from wood ash; and castor bean plants are not unusual in the North Georgia area. Moreover, Mr. Crump knows a viable recipe for ricin by heart. Furthermore, Mr. Crump may be able to obtain other weapons for use against Government employees or officials from a sympathizer or another member of the covert group who remains at large. Indeed, at least one such covert group member has previously provided a firearm to one of his co-defendants.

Mr. Crump has expressed his desire and intent to cause widespread harm, including death, to both Government employees and civilians. It is not likely that these intentions have diminished with his arrest and the initiation of this prosecution against him. Rather, the contrary is true. Furthermore, Mr. Crump faces a life sentence if convicted, and he is in poor health. Thus he may feel he

has nothing to lose by seizing any opportunity to realize the goals of the covert group at least in part.  Neither GPS monitoring, home confinement with electronic monitoring, secured bonds, nor any other condition suggested by counsel—or that the undersigned can imagine—will assure that Mr. Crump, if released on bond, would not gain access to an instrument of harm and use it to carry out an act of violence against a Government official or employee, such as a United States Probation Officer assigned to monitor him prior to trial or United States Marshals designated to transport him to court appearances should he refuse to appear on his own.

The Government has properly invoked the rebuttable presumption triggered by the charge against Mr. Crump.  While he has produced evidence to rebut that presumption, the Government has shown by clear and convincing evidence that, when all the relevant factors are viewed together, there are no conditions of release for Mr. Crump that will reasonably assure the safety of the community.

### 4. <u>Ray Adams</u>

#### a. <u>Nature and Circumstances of the Offense Charged</u>

The offenses charged in the indictment against Mr. Adams involve potential biological weapons, <u>see</u> 18 U.S.C. § 175(a), and are considered federal crimes of terrorism pursuant to 18 U.S.C. § 2332(g)(5)(B).  Based on these charges, the Government has invoked the rebuttable presumption provided by 18 U.S.C. § 3142(e)(3)(C) that there are no conditions of release that will reasonably assure the safety of the community.  If Mr. Adams is convicted, he faces a potential life

sentence.

This factor weighs heavily in favor of detention.

### b.  <u>Weight of the Evidence</u>

The evidence showing Mr. Adams' dangerousness includes, among other things, the following: Mr. Adams was invited to join the covert group during a meeting including Mr. Adams, Co-defendants Frederick Thomas and Emory Dan Roberts and others on April 16, 2011 at which Mr. Thomas talked about the need to take action against the federal Government, to include assassinating Government officials (Adams Aff. ¶ 7).  In response to the invitation, Mr. Adams replied, "Thanks" and "I'm very interested in this."  Mr. Adams answered "I am" in response to the question whether those present were committed to taking action against the Government and he stated, "I'd say the first ones that need to die is the ones in government buildings" (<u>id.</u>) and that he was "willing to take a life."  Mr. Adams also suggested that they make Government offices toxic so employees could not conduct business and stated that what people can't see is what scares them the most.  At that meeting, Mr. Adams also offered the use of his 17-acre property for the group to meet.

Mr. Adams grows castor bean plants on his property,[7] and at an October 15, 2011 meeting of Defendants Thomas, Roberts, Crump, Adams and others at Mr.

---

[7] There was testimony at the hearing that many people grow castor plants in the North Georgia area, both because the beans are believed to ward off moles and because the plants are attractive.

Adams' house, a storage bin containing castor beans was observed  (Adams Aff. ¶ 24).  Mr. Adams stated at the meeting that while he had never made ricin, he had enough lab experience to do it.  (Id. ).  He also explained that a splash of the substance could kill someone and that there was no antidote.  (Id.).  At an October 29, 2011 meeting, Mr. Adams told a confidential source how to use lye to remove the castor bean shell and stated that he planned to make his own lye by leaching it from wood ashes.  (Adams Aff. ¶ 26).   The search of Mr. Adams' residence following his arrest on November 1, 2011 revealed a recipe for ricin (Gov. Ex. 1), harvested castor beans in their husks, acetone and more than a dozen firearms (one at every entrance, including doors and windows)[8] and ammunition.

This factor weighs heavily in favor of detention.

### c.  History and Characteristics

Mr. Adams is 55 years of age and retired.  He depends on Social Security benefits and a federal pension for income.  He lives alone on 17 acres of land.  He grew up in Stephens County, but he lived in Warner Robins for 20 years until about five years ago.  He has lived in Toccoa for the past 3 years.  Mr. Adams has three brothers who live in Georgia; he is separated from his wife and he has a 22-year old daughter who is about to graduate from college and plans to enter the criminal justice field.  Mr. Adams worked for the U.S. Department of Agriculture as a biological technician for plant science from 1981 to 2006, when he retired

---

[8] Mr. Adams' brother testified that Mr. Adams used to hunt a little but that he did more fishing.

after neck surgery.  He is in poor health due to his neck problems which required surgery and the insertion of a titanium plate in his neck, high blood pressure, chronic pain and neuropathy in his feet.  He has no criminal history.

As with Defendants Thomas, Roberts and Crump, Mr. Adams' age and infirmity may indicate that he is not able to carry out an act of violence requiring strength and stamina, but they do no make him incapable of committing other acts of violence or targeted assassinations, or of producing, assisting in the production of, or using a biological weapon.  Mr. Adams' work for the Department of Agriculture may have provided him know-how and access to information useful to the production and/or safe handling of ricin.

All told, this factor weighs moderately in favor of detention.

### d. <u>Nature and Seriousness of the Danger Posed by Mr. Adams' Release</u>

There is strong, credible evidence that Mr. Adams has been involved with a covert anti-Government group that has been planning to take violent action against Government officials and employees and civilians.  The group's plans include killing Government employees and officials with silent methods, including by means of biological toxins that could also harm or kill civilians.  The group has taken concrete steps toward realizing their plans, including beginning the production of ricin using a recipe that is viable and that uses ingredients that are readily available.  Ricin is lethal, has no benign use, and no known antidote.

This factor weighs heavily in favor of detention.

25

### e. **Inadequacy of Conditions of Release to Address Dangerousness**

While the Government has seized the firearms and ammunition, and presumably the harvested castor beans and acetone, found at Mr. Adams' residence, that fact does not preclude the possibility that Mr. Adams could carry out the covert group's plans to some degree and in some fashion if released on bond. It does not with certainty eliminate his access to instruments of harm, including the readily available ingredients to make ricin. Moreover, Mr. Adams had at his residence a printed recipe for ricin, which was apparently obtained from an internet source by someone else (the testimony showed that Mr. Adams did not have internet access) and provided to Mr. Adams, and Mr. Adams stated that he had the lab experience to make ricin. Furthermore, Mr. Adams may be able to obtain other weapons for use against Government employees or officials from a sympathizer or another member of the covert group who remains at large. Indeed, at least one such covert group member has previously provided a firearm to one of his co-defendants.

Mr. Adams has expressed his desire and intent to cause widespread fear and harm, including death, to Government officials and employees. It is not likely that these intentions have diminished with his arrest and the initiation of this prosecution against him. Rather, the contrary is true. Furthermore, Mr. Adams faces a life sentence if convicted, and he is in poor health. Thus he may feel he has nothing to lose by seizing any opportunity to realize the goals of the covert

group at least in part.  Neither GPS monitoring, home confinement with electronic monitoring, secured bonds, nor any other condition suggested by counsel—or that the undersigned can imagine—will assure that Mr. Adams, if released on bond, would not gain access to an instrument of harm and use it to carry out an act of violence against a Government official or employee, such as a United States Probation Officer assigned to monitor him prior to trial or United States Marshals designated to transport him to court appearances should he refuse to appear on his own.

The Government has properly invoked the rebuttable presumption triggered by the charges against Mr. Adams.  While he has produced evidence to rebut that presumption, the Government has shown by clear and convincing that, when all the relevant factors are viewed together, there are no conditions of release for Mr. Adams that will reasonably assure the safety of the community.

III.   **Conclusion**

In sum, there are no conditions of release for any of the defendants that will reasonably assure the safety of the community and it is therefore **ORDERED** that each of the defendants be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. It is further **ORDERED** that each defendant be afforded reasonable opportunity for private consultation with counsel; and it is further **ORDERED** that, on Order of a Court of the United States or on request of an attorney for the Government,

the person in charge of the corrections facility in which each of the defendants is confined deliver that defendant to a United States Marshal for the purpose of an appearance in connection with a Court proceeding.

      **IT IS SO ORDERED** this 21st day of November, 2011.

*Susan S. Cole*
SUSAN S. COLE
United States Magistrate Judge

28